235 N.J. Super. 434 (1989)
563 A.2d 64
DOLLIE S. HARRIS, PLAINTIFF,
v.
WILLIAM HARRIS, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Bergen County.
Decided May 5, 1989.
*437 Anthony Speranza, for plaintiff.
William J. Pollinger, for defendant.
Marianne Quinn, guardian-ad-litem.
KRAFTE, J.S.C.
Plaintiff, Dollie and defendant William Harris were married on June 25, 1977. Two children were born of the union, David, age ten and Samantha, age eight.
After several years of marriage, Dollie Harris filed a complaint for divorce. An accountant was appointed to evaluate the marital assets and liabilities. Both parties and the children were represented by independent counsel.
The parties executed a Property Settlement Agreement, hereafter referred to as Agreement, on May 9, 1986, which is also the recited effective date of same. The Agreement was memorialized in court at Final Hearing on May 9, 1986. The actual Final Judgment of Divorce was signed on December 19, 1986. Of significance are the facts that both spouses waived any right to support from one another, that defendant warranted that "as of the effective date of this Agreement he earns or is capable of earning a gross annual income of the approximate amount of $50,000.00 a year", that defendant acknowledged that "he owes the wife the sum of $80,000.00 in additional child support and maintenance as of the effective date of this Agreement, and that defendant agreed to monthly payments in the amount of $1,675.00 "for the support and maintenance of children" beginning on June 1, 1986. The parties negotiated an installment payment plan for the arrearages. This court finds that the settlement agreement was a lengthy, carefully considered document which encompassed all areas of dispute and contained schedules for resolution of all items from arrears to visitation.
On November 19, 1986 a Notice of Motion for Enforcement of Litigant's Rights was received from plaintiff's counsel, alleging that defendant had failed to follow through in several areas of *438 the Agreement. Specific to the issues addressed herein, defendant failed to provide five months of child support, and paid only $7,000.00 towards the first installment of $10,000.00 due and owing with regards to the $80,000.00 arrearage figure. (As of February 9, 1989, defendant owed plaintiff child support in the amount of $81,017.50 pursuant to the applicable clauses of the Agreement). Defendant's cross-motion, received on January 9, 1987, sought, in pertinent part, modification of the arrears and reduction in his monthly support obligation. The proffered basis for relief was his alleged change of circumstances. Interim steps towards resolution, including a re-investigation by the court appointed accountant, were ordered to facilitate resolution of some issues and preparation of others for a plenary hearing.
Each of the parties continued to file various applications on the topic of visitation and related disputes. In particular, on June 29, 1988, plaintiff filed an Order to Show Cause. She planned to vacation with the children in Florida and sought non-interference from defendant. During a conference between this court and counsel, plaintiff's attorney advised that Mrs. Harris wanted to move to Florida with the children on a permanent basis. An Order was issued on July 1, 1988 stating that the children's permanent removal to Florida would be addressed along with the issue of child support at the plenary hearing which was subsequently held on several days in February of 1989.

MODIFICATION OF CHILD SUPPORT
As of February 9, 1989 the time of the plenary hearing, defendant owed $81,017.50 in child support arrearages. William Harris states that pursuant to Lepis v. Lepis, 83 N.J. 139 (1980), he is entitled to a modification in his monthly child support obligation. In essence, defendant applies to this court to be relieved from his obligations set forth in a fully negotiated *439 agreement with plaintiff for which each party gave due and full consideration.
Defendant holds a masters degree in business administration and has worked primarily in the field of survey and market research for the past twelve years. Recently, he taught two courses at Manhattan Community College for which he earned approximately $3500.00. Defendant has been the president and owner of two companies, William H. Harris Co., and Library Access Co.
Mr. Harris' financial lifestyle can be described as perplexing at best. He claims a zero income in 1986, approximately $4500.00 for 1987 and an approximate amount of $9000.00 for 1988. He resides with Damyanti Hari, his fiancee, who works at three separate and distinct places of employment six and one half days a week and according to defendant, pays all rent and daily living expenses for both of them. Mr. Harris testified to borrowing large sums of money from his fiancee, relatives and friends, borrows the use of automobiles from the same sources, including his fiancee's Jaguar and has made some child support payments with nontraceable money orders. In 1986, he inherited a Florida condominium and sold it to a cousin.
Defendant alleges that he has been unable to obtain employment in his chosen field of market research and points to corporate mergers and new corporate priorities during 1986 and 1987 as the cause and effect impact on his income. While such market activity may have narrowed Mr. Harris' choices of employment, it has neither relieved him of his responsibility to support David and Samantha, nor has it made the need of the children for food and clothing any less. This court recognizes that defendant has unsuccessfully applied for market research jobs and has obtained a teaching position for which he earned approximately $3500.00. However, this, without more, is insufficient and falls far below any semblance of any good faith attempt on his part to provide even minimal support for his children. Defendant and his children "cannot afford the luxury *440 of his waiting for employment in his field", Arribi v. Arribi, 186 N.J. Super. 116, 118 (Ch.Div. 1982), or in the particular case of Mr. Harris, the continued benevolence of so many family and friends who have allegedly gifted and loaned hundreds of thousands of dollars to him. This court finds as fact that Mr. Harris has the ability to earn more than $3500.00, has himself set his earning power at $50,000.00, and in fact, has not provided sufficient proof of a diminished capacity to earn said amount. Parenthetically, it is observed that defendant paid absolutely no support during this plenary hearing.
As further evidence of his changed circumstances defendant relies on three petitions for bankruptcy. The first was executed on May 27, 1986 by Mr. Harris as president of the Library Book Access Corp., A MERE THREE WEEKS AFTER THE PARTIES ENTERED THE AGREEMENT. The second bankruptcy petition was marked filed on December 30, 1986 and executed on April 14, 1987 by Mr. Harris as president of the William H. Harris Co., Inc. The third and last bankruptcy petition for personal debts was executed by Mr. Harris on January 8, 1987. The latter two bankruptcy petitions and defendant's cross-motion for modification of child support and elimination of arrears are in perfect sequential order.
During the plenary hearing the court appointed accountant testified that he was involved in the negotiations resulting in the Agreement and had since the filing of the motion and cross motion sub judice reviewed the bankruptcy petitions along with other documents. As to Mr. Harris' alleged changed circumstances, the accountant found that the bankruptcy petitions "didn't tell anything new." The fact that the debts of defendant's two companies exceeded their assets was known to Mr. Harris prior to and concurrently with his entering the Agreement. The accountant further testified that at the time of the final judgment of divorce, Mr. Harris had a de minimus income and there was no great change, in fact, his income increased from zero in 1986 (time of agreement) to $4,500.00 in 1987 and to $9,000.00 in 1988.
*441 This court finds as fact that defendant has failed to provide proof that his circumstances changed for the worse during the period May 8, 1986 to January 9, 1987, or to the present, but, in fact, improved. Defendant has failed to provide this court with proof that his earning ability is less than he previously stated and he certainly has not shown a decrease in income during the aforementioned time period. In actuality, he may very well be in better stead financially as a result of debt clearance through the bankruptcy petitions. This court finds that the defendant has no intention of finding substantial employment in his or any other field. This court finds that defendant has found his niche in this world, in that he is maintaining a high lifestyle without having to work for it. To use the vernacular, he has it made. This court finds that defendant is content to sit back and become a complete human parasite,[1] permitting a succession of fiancees, friends and relatives to provide for him so as to enable him to live in and maintain a lifestyle commensurate with his self-imposed high standard of living, while his children are reduced to the status of virtual beggars. He professes love and concern for them, yet this court finds a complete lack of same. Defendant's application for modification of child support is denied.

RETROACTIVITY OF N.J.S.A. 2A:17-56.23a
Mr. Harris' request to eliminate child support arrears presents an issue of first impression. A new statute, N.J.S.A. 2A:17-56.23a states, in part, "[n]o payment or installment of an order for child support ... shall be retroactively modified by the court except for the period during which the party seeking relief has pending an application for modification ...". This *442 statute became effective on November 21, 1988. The question to be determined is whether or not this statute applies to the action herein. As expected, plaintiff argues the statute applies and this court is precluded from eliminating or modifying arrears while defendant argues that the statute applies only to applications made after November 21, 1988.
As set forth above, this court has held that defendant's monthly child support obligation will not be modified. Thus, although the statute provides for modification only during the pendency of an application, since modification will not be allowed for other grounds, this court does not have to address the arrears pending since January of 1987 and they will not be modified.
As to the sum of some $80,000.00 this amount was established by the parties in the Agreement of 1986. Defendant's argument that these monies included maintenance for plaintiff is without merit and must fall. This court finds that the language of the Agreement "[H]usband acknowledges and agrees that he owes the wife the sum of $80,000.00 in additional child support and maintenance" are precise and designate the entire sum as child support. Defendant proffers that "and maintenance" relates to spousal support and therefore takes this sum out of N.J.S.A. 2A:17-56.23a's reach. This court disagrees. Both plaintiff's express waiver of spousal support and the caption of the above quoted section which reads "Child Support and Maintenance in Arrears" clearly and without question indicate that the parties recognized that this amount was child support only.
During oral argument, defendant stated that the statute, based on statutory construction and legislative intent, was to apply prospectively only. The legislative history is scant. However, statements accompanying this statute identify child support arrearages as a cause of unjust hardship on the family and stated the new procedures adopted in N.J.S.A. 2A:17-56.23a are necessary to ensure that the arrearages owed to the *443 children are treated with the highest regard. As such, this court finds the purpose and effect of the statute to be a curative one. Once the purpose of the statute is identified it is of utmost significance to recognize that the $80,000.00 sought are not the type of functionally dormant arrears addressed in Tancredi v. Tancredi, 101 N.J. Super. 259 (App.Div. 1968). Here, defendant memorialized his obligation in the Agreement of May 1986 and plaintiff, on behalf of the children, has attempted ever since to collect the funds due and owing.
Justice Pashman in Gibbons v. Gibbons, 86 N.J. 515 (1981) provides a comprehensive grouping and review of legislation and circumstances that "should be applied retroactively" when there is no clear intent by the legislature of prospective application only. The statute herein falls squarely within two such categories, to wit: when the intent may be implied to allow retroactive application to make the statute workable or give it the most sensible interpretation, and when the purpose is ameliorative or curative. Id. at 522-523. Certainly, if elimination or modification of $80,000.00 in child support arrears would cause a family hardship on November 21, 1988, logic will not allow the reverse to be true! Thus from both a curative and sensible standpoint, the loss of this money to the children will work an extreme hardship. Therefore, although not expressly stated, statute retroactivity is preferable under this approach.
Gibbons, supra, continues to advise that once the purpose of the statute is determined, the final inquiry is whether or not the "retroactive application will result in manifest injustice to the party adversely affected." Id. at 523. This court answers in the negative. Mr. Harris, represented by counsel, warranted his then present earnings or earning abilities and knowingly entered a bargained for and fully negotiated agreement. He was well protected while it is his children who have suffered the consequences of his irresponsibility and will be dealt a manifest injustice if arrears are eliminated.
*444 Counsel for defendant likened a portion of the analysis in Gibbons to Masel v. Paramus, 180 N.J. Super. 32 (App.Div. 1981) which concerned itself with an act passed to bring uniformity to the terms served by municipal clerks. The reliance on Masel, in which the Appellate Division stated "[W]e can find nothing in the record that even suggests that the prior lack of uniformity in terms was an `evil', to use the word of the trial judge, which required remedy" is misplaced. Id. at 40. Here, the legislature has mandated that child support arrears are not to be modified and this court must conclude that which would have a harmful effect on November 21, 1988 to the children of our state would have the same effect on November 20, 1988.
In applying N.J.S.A. 2A:17-56.23a this court finds no violation of Mr. Harris' rights to due process afforded by the Constitution. U.S. Const. Amend. XIV; N.J. Const. (1947), Art I, par. 1. Mr. Harris complains that had the plenary hearing been held prior to the statute's enactment, this court could have modified the arrears. In actuality, this court could have considered modification of all or part of such arrears. It is beyond argument that there was no vested right possessed by Mr. Harris to modification itself. Such consideration, now removed, was this court's discretion, not something which belonged to the defendant as of right.
Due process will prohibit retroactive application when the consequences are "particularly harsh and oppressive." In re Kaplan, 178 N.J.Super 487, 495 (App.Div. 1981). Mr. Harris in this regard once again views himself as the blameless victim. This court finds no harsh and oppressive effect resulting from an order which compels a father to provide that amount of child support which he negotiated, agreed to, is obligated to pay and which he warranted he was able to do. As stated in Rothman v. Rothman, 65 N.J. 219, 226 (1974) citing Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), "due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious and that the means selected *445 shall have a real and substantial relation to the object sought to be attained." The aforementioned is strictly social legislation and has in part, the highly salutory purpose of alleviating the hardship that befalls unsupported children. This court finds that N.J.S.A. 2A:17-56.23a is not unreasonable, arbitrary or capricious and is substantially and directly related to its objective. Certainly, this statute, which simultaneously enhances the court's parens patriae role while decreasing the court's discretion by its mandate, meets the due process standard.
Intertwined with the notion of the court's role as protector of children is the state's police power authority to pass legislation which promotes health, safety, morals or general welfare. U.S. Const., Amend. XIV; N.J. Const. (1947), Art. I, par. 1. Certainly a statute which provides that the full amount of support due children shall not be modified has as its central purpose the promotion of children's health and general welfare. Retroactive application of legislation employing the state's police power has been upheld "provided the public interest to be promoted sufficiently out-weighs in importance the private right which is impaired." See Rothman v. Rothman, supra. 65 N.J. at 225-226. This court reiterates that the only private right of Mr. Harris was for consideration by the court of modification or elimination of child support arrears due and owing. This court, parenthetically, notes that Mr. Harris has not even provided so much as $100.00 per month to his children during the pendency of this action. The children are clearly entitled to the protection of this court, to its fullest ability.
The above reasoning is also set forth in Hart v. Fox, 204 N.J. Super. 564, 570 (Law.Div. 1985) which states
"[I]t is a general rule of law that statutes which are remedial in nature are entitled to a liberal construction in favor of the remedy provided by law or in favor of those entitled to the benefits of the statute."
As set forth earlier, N.J.S.A. 2A:17-56.23a is remedial in nature and the Harris children are entitled to its protection. It is the children for whom the statute was enacted to protect, not the non-complying parent. To apply this statute prospectively only *446 would continue "the inequity recognized and intended to be cured by the legislature and resurrects the difficulties of enforcement..." Hart v. Fox, supra at 574.
In support of applying this statute retroactively, this court also relies on the holdings in Chalmers v. Chalmers, 65 N.J. 186, 190-191 (1974) and Bellinger v. Bellinger, 177 N.J. Super. 650, 654 (Ch.Div. 1981): "[T]he law in effect at the time the action was tried controls." It is clear that this statute is intended to benefit recipients of support, not the payors as such. Therefore, any uncertainty as to its applicability as far as the recipient is concerned should be resolved to the benefit of the recipient and therefore retroactivity must be afforded to this statute and to defendant's motion. Any element of unfairness to defendant must give way to the overriding social good for which the statute provides. This court, pursuant to the mandate in N.J.S.A. 2A:17-56.23a will neither eliminate nor modify any of the child support arrears, particularly those arrears existing at the time defendant filed the motion, as this court finds that the statute is to be retroactively applied.

REMOVAL
Mrs. Harris requests permission to remove the children from the State of New Jersey on a permanent basis. As the underlying basis for this request, Mrs. Harris testified that she has become engaged to John Dickinson after knowing each other for some two years. Mr. Dickinson resides and owns a computer consultant business in Jupiter, Florida. If plaintiff and the children are permitted to move to Florida, she and Mr. Dickinson will marry within three to six months. If she is not permitted to move, the relationship will not survive.
Mr. Dickinson testified to three primary reasons for his move to Florida. His relatives are located there. His asthmatic condition lessens in the Florida climate, thus his overall health improves. Most importantly, Mr. Dickinson said he looked into business and market trends prior to his move and learned that *447 the Jupiter, Florida area is among the five fastest growing in the country for his line of work.
John Dickinson said he was unwilling and basically unable to relocate to New Jersey. His health worsens and the career opportunities are not present here as they are in Jupiter. He cannot effectively relocate even if Mrs. Harris and the children cannot move to Florida.
This court approaches this issue with a reminder from D'Onofrio v. D'Onofrio, 144 N.J. Super. 200 (Ch.Div. 1976) aff'd o.b. 144 N.J. Super. 352 (App.Div. 1976) that our statute provides for judicial discretion in this area. Furthermore,
"[T]he court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable lifestyle for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial."

Id. 144 N.J. Super. at 207.
Mrs. Harris testified that she would like to move to Florida with the children, marry John Dickinson and begin a new life. The cost of remaining in New Jersey has also become exhorbitant and she finds managing financially increasingly difficult, especially since Mr. Harris provides virtually no support.
As part of the divorce settlement, the marital residence is in Mrs. Harris' name only. There is a mortgage on the property for approximately $100,000.00. Mrs. Harris listed the house for sale in the spring of 1988 because the cost of the mortgage, property taxes and maintenance became more than she could manage. In addition, she owes family and friends approximately $200,000.00. Although the personal loans would remain, housing costs would drastically decrease if Mrs. Harris moves to Florida.
Gina Ginsberg Riggs, Executive Director of the Gifted Child Society, testified on behalf of plaintiff. She stated that Florida is a national leader in school programs for gifted children and provides tuition free kindergarten through twelfth grade education for gifted children. Mrs. Harris testified without contradiction *448 that David is a gifted child, and currently attends Saddle River Day School as the most suitable program in the area for his abilities. Tuition is approximately $9,000.00 per year. David received a nonrenewable scholarship for the current academic year; thus his tuition is approximately $3500.00. This year Mrs. Harris has explored the schooling available in Jupiter, Florida and found there is a full-time gifted school program available through the public system. Each child follows an individual program and is integrated with the main student body for all sports and extracurricular activities. There is a continuum from grammar to high school.
Mrs. Harris stated that the move will also be beneficial to Samantha, an asthmatic. Her allergies and hay fever lessen and cause less discomfort in Jupiter's climate.
This court finds that plaintiff's desire to marry, join her fiance in Florida and begin a new life is a sincere, good faith reason and not motivated by an intent to thwart Mr. Harris' visitation rights pursuant to the standard set forth in Holder v. Polanski, 111 N.J. 344, 352-353 (1988). Subsequent to the Holder v. Polanski, supra, decision, the Appellate Division set forth the following consideration in Murnane v. Murnane, 229 N.J. Super. 520 (App.Div. 1988).
"... in view of the Holder court's emphasis on the parity of men and women, in seeking to determine whether the move can be made without substantive detriment to Andre's interests and Mr. Murnane's visitation rights, the trial court should also weigh the burden which Mr. Murnane would suffer if he is forced to relocate in order to remain close to Andre against the burden which Ms. Scott will have to bear if she is forced to remain in East Stroudsburg in order to retain custody."
The right to marry is a substantial one. If not permitted to move out of state, Mrs. Harris will be forced to choose between the love of her children and a desire to begin a life with a man she loves who is also willing and able to provide a home for her and her children and assist her financially. This court notes that according to Mr. Harris, he does not have the present ability to provide a home for the children. He lives in Ms. Hari's apartment and states that he cannot afford to take the *449 children to movies or rent ice skates during visitation when the children suggest such activities. He discusses the costs of tolls and gasoline to transport the children in cars borrowed from others. If one were to take Mr. Harris' testimony as credible, which this court does not, where would this leave David and Samantha assuming Mrs. Harris chose to leave New Jersey without them? The question defies an answer.
As to the issue of credibility, this court has seen Mr. Harris during the course of a lengthy trial. His suits are rather business like and upscale, he drives Ms. Hari's 1982 Jaguar which she purchased new. Mr. Harris testified that the apartment he shares with Ms. Hari, and for which she pays, is within walking distance of the Museum of Natural History. This court finds as incredible that Mr. Harris can borrow more than $100,000.00 from Ms. Hari, know that Ms. Hari works six and one half days each week for ICL Leasing, Inland Services and Agura, a combination restaurant/clothing store, and not know her income. Mr. Harris directly contradicted himself in his testimony before this court on at least one occasion. On direct examination, he stated he currently pays $300.00 a month in child support and on cross-examination acknowledged he paid zero for the months of January and February 1989.
Mr. Harris, a bank vice-president for twenty years, has testified to his lack of steady employment, being only able to obtain a job teaching two courses at a local college. Pursuant to Murnane, supra, this court finds there would be no substantial burden placed on Mr. Harris' move to Florida; to wit: he has no apartment, no income and no specific plans to marry Ms. Hari although they have known one another for more than ten years. Of course, if he moved to Florida he would be required to join the mainstream of American life in that he would have to become gainfully employed, and would have to support himself, let alone his children. The great detriment to such a move would be the necessity of relinquishing his parasitic existence, which would probably be too much to ask. Conversely, *450 there would be substantial detriment suffered by Mrs. Harris if not allowed to move.
This court also finds as fact that Mr. Harris has known since July of 1988 that plaintiff has wanted to move to Florida and of the financial pressures she was under. This court finds Mr. Harris has done nothing to alleviate the responsibilities placed upon plaintiff as the custodial parent, including paying any amount of child support even as he sits in this courtroom for a plenary hearing. He, additionally, opposes plaintiff's attempt to "seek opportunities for a better or different life style". D'Onofrio v. D'Onofrio, supra 144 N.J. Super. at 207.
Since this court has found that Mrs. Harris' desire to move is based on sincere good faith reasons, attention must now be placed on "whether the move will be inimical to the best interest of the children." Holder v. Polanski, supra, 111 N.J. at 352-353. The court appointed guardian ad litem, Marianne Quinn, and psychiatrist Dr. Charles Goodstein stated a move would be inimical to the children's best interests. Their reasons are basically: that Mr. Harris and the children ought to continue bonding and strengthen their parent-child relationship. In order to do so, Mr. Harris and the children will require joint therapy and continued overnight visitation every other weekend. These goals will not be accomplished if Mr. Harris remains in New York and the children move to Florida with Mrs. Harris. There are two unexplored areas here; there is no guarantee that the children and father will engage in regular on-going therapy and there is the possibility that Mr. Harris can relocate to Florida as mentioned earlier.
After the many years of litigation engaged in by the parties, if plaintiff is required to remain in this area, this court cannot see an end. The children are entitled to a time to rest, to savor life and to the better, non-financial things a semblance of peace and contentment can bring. Remaining in New Jersey can bring none of this to the children, and can only lead to their emotional destruction. This court finds that both the guardian *451 ad litem and the court appointed psychiatrist were apparently more concerned with preservation of the best possible relationship between defendant and the children than approaching the problem from the best interests of the children. Cooperation by defendant in Florida visitation, commensurate with his ability, as found by the court, will enable him to maintain a proper relationship with the children and to further bonding. This court further observes that defendant's prior drug addiction and usage contributed to his past difficulties with the children.
If compelled to remain in New Jersey and to participate in therapy, there will undoubtedly be quarrels as to the therapist, quality of therapy, frequency, whether therapy is also visitation time and dissatisfaction ad-infinitum. This court does not find this alternative in the best interests of the children. This court views the move to Florida as the only opportunity presented to the children in years for them to have some normalcy and semblance of a family lifestyle and to rest. Hence, this court finds that the move to Florida is not inimical to the best interests of the children, and is in actuality, in their best interests, and further finds it is the least detrimental alternative.
The next test under Holder v. Polanski, supra, is whether the move will adversely affect the visitation rights of the non-custodial parent. This court finds that Mr. Harris has the available financial resources or more importantly the ability to obtain them, whether through gainful employment or otherwise, in order to maintain contact and visitation with the children. He has twenty years experience as a bank vice-president, a masters degree in business administration and has warranted an ability to earn approximately $50,000.00 annually. He also has relatives that reside within a 100 mile radius of Jupiter, Florida with whom he can stay during visitation periods. Mrs. Harris has also offered to reduce the amount of arrears dollar for dollar of the sums expended by Mr. Harris *452 for visitation. This court finds that William Harris has failed to meet his burden of proof and
"come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child(ren)." Murnane v. Murnane, supra, citing Cooper v. Cooper, 99 N.J. 42, 57-58 (1984).
This court therefore authorizes Mrs. Harris to move to Florida on a permanent basis with David and Samantha. The following conditions will, however, be placed on their move.
All sums expended by Mr. Harris for transportation and lodging on behalf of himself and the children will be credited in equal amount toward his child support arrearages.
Mrs. Harris will be responsible for fifty percent of the children's visitation expenses, provided defendant makes current support payments as required.
No move shall occur before the children finish the current school year in June of 1989.
In accordance with Dr. Goodstein's recommendations, the children are to spend five to seven weeks with Mr. Harris in the summer, exclusive of the last week before they begin school in September. Thanksgiving will be spent with Mr. Harris. Christmas and Easter/Spring school recesses shall be shared, with the children spending at least five nights with Mr. Harris. Mr. Harris is encouraged to travel to Florida, whenever possible, to see the children. On such occasions a Friday to Sunday evening visit shall be allowed.
Mr. Harris shall provide 60 days notice of summer visitation and 30 days notice of all other visitation, except when he travels to Florida, when 48 hours notice will be provided.
This visitation schedule shall begin simultaneously with the children's physical absence from New Jersey. In the meantime, overnight visitation shall occur every other weekend.
Plaintiff's counsel shall submit an appropriate order.
NOTES
[1] "One frequenting the tables of the rich and earning welcome by flattery; an organism living in or on another organism; something that resembles a biological parasite in dependence on something else for existence or support without making a useful or adequate return." Webster's Seventh New Collegiate Dictionary, 1970 at 611.